STATE OF NEW JERSEY, DEFENDANT IN ERROR. v. PETER DORO, ALIAS PETER BRUNO, PLAINTIFF IN ERROR.

Argued May 18, 1926—Decided September 30, 1926.

1. Evidence considered, and *held*, that the verdict of murder in the first degree is not against the weight of the evidence.

2. When the trial of the indictment for murder was moved and the clerk called the roll of the special panel of forty-eight jurors which had been drawn from the general panel, pursuant to section 82 of the Criminal Procedure act (*Comp. Stat., p.* 1847), and served upon the defendant, only sixteen of these jurors answered to their names. Thereupon, the defendant moved for an adjournment, which the court denied. On error, defendant contended that the judgment should be reversed because he was deprived of his right to investigate the general panel, and so prepare to exercise his right of challenge intelligently. *Held*—in view of the provisions of section 83 of the Criminal Procedure act, that when such special panel is exhausted before a jury shall be obtained, talesmen shall be taken from the general panel of jurors, if any remain, and the defendant shall not be entitled to the service of a list of talesmen taken from the general panel—that the denial of the motion for an adjournment, being within the discretion of the court, will not lead to a reversal unless it appears that the defendant suffered manifest wrong or injury, and that there is no such showing when the record discloses that the defendant used but seven of the twenty peremptory challenges to which he was entitled, and when there was nothing to indicate but that he was entirely satisfied with and accepted the two jurors who were drawn from the general panel.

3. It is proper for the state, on redirect examination, to draw from a witness an explanation of his statement on cross-examination, or matters brought out on cross-examination.

4. On trial for murder, a question to a witness designed to clear up an ambiguity in her statement on cross-examination as to the period of time that intervened between the quarrel in the kitchen and the subsequent·killing, was proper.

5. In a trial for murder an exclamation that "he has just murdered somebody—catch him," made by a bystander as she, screaming, pursued the defendant in his flight from the house to the street immediately after the killing, which she had witnessed, is a part of the *res gestæ*, and is admissible in evidence.

6. When it appeared that the deceased wife of the witness spoke some Italian when he (an Italian) married her, and that they had lived together for four years, it was competent for the husband, as against an objection that the witness did not know what his wife understood, to testify as to whether or not she under-

stood and spoke Italian. The testimony was admissible, not as an expert's opinion, but because a lay witness may state the inference drawn by him from facts within ordinary knowledge occurring in his presence.

7. A plaintiff in error cannot complain of an error in an instruction which was given at his request.

On writ of error to the Essex County Oyer and Terminer Court.

For the plaintiff in error, *James Mango* and *Nicholas La Vecchia.*

For the defendant in error, *John O. Bigelow,* prosecutor of the pleas.

The opinion of the court was delivered by

TRENCHARD, J. The plaintiff in error, Peter Doro, alias Peter Bruno, hereinafter called the defendant, was indicted in the Court of Oyer and Terminer of Essex county for the murder of Anna Abramowitz. He was convicted of murder in the first degree, and no recommendation of life imprisonment being made by the jury, he was sentenced to death. He now brings up for review that judgment, both by bill of exceptions and by specifications of causes for reversal under section 136 of our Criminal Procedure act. *Comp. Stat., p.* 1863.

It is contended that "the verdict of murder in the first degree was against the weight of the evidence." We think it was not.

At the trial the evidence tended to show, among others, the following matters of fact:

Doro, the defendant, first met Mrs. Abramowitz, the decedent, early in the year 1923 in Boston, where she was living with her husband. Shortly thereafter Mr. and Mrs. Abramowitz moved to Cleveland, Ohio, and the defendant, with his wife—for he also was married—followed her there. In Cleveland the defendant deserted his wife and brought Mrs. Abramowitz to Newark, where they took rooms on Wal-

nut street. Early in October, 1925, the defendant arranged for her to go into a house of prostitution in New Brunswick to obtain money with which to pay for furniture. He accompanied her to the train. She returned in two weeks with $191. The defendant earned no money while in Newark. They quarreled frequently, the defendant calling her foul names unfit to print, and at times struck her. Early in November, 1925, they moved into an apartment on North Fifth street, which they shared with Mr. and Mrs. McKenna.

Thus far there is no substantial dispute in the testimony, although the defendant testified that Mrs. Abramowitz went to New Brunswick for the purpose of prostitution of her own volition and against his protest.

The state's case further tended to show the following more important matters of fact: In the early morning of November 11th (the day of the tragedy), the defendant and Mrs. Abramowitz had a bitter and violent quarrel, the result of the defendant's unnatural sexual practices upon Mrs. Abramowitz. That quarrel was composed upon Mrs. McKenna's entrance into their bedroom. That evening Mrs. Abramowitz and Mrs. McKenna went to a moving picture house, the defendant remaining in the apartment with Mr. McKenna. The latter went out about nine-thirty P. M., leaving the defendant alone. The women returned at ten forty-five P. M. Then, after the women had prepared tea, the quarrel which was to result in murder began. After the exchange of offensive epithets, the defendant "slapped" Mrs. Abramowitz in the face and she "slapped" him. Then he "grinned" at her and said, "you have got to die."

He went into adjoining rooms three times, and each time returned to the kitchen. When he entered the kitchen the third time Mrs. Abramowitz was wiping off the stove. He sprang upon her, forced her into a corner, and slashed her neck three times with a razor, inflicting the fatal wounds. Mrs. McKenna, who was standing by, screamed. Covered with blood, he thereupon immediately rushed into the street, pursued by Mrs. McKenna, who screamed "he has just murdered somebody—catch him." A policeman nearby ran after

the defendant, who fled down North Fifth street to Sussex street, where he turned east and jumped into a passing automobile. Another officer joined the chase, commandeered another car, and caught up with the defendant and subdued him after a struggle.

At the trial the defendant did not deny any of these occurrences on the day of the tragedy. He testified that after the women had gone to the theatre he commenced drinking alcohol mixed with water, in company with Mr. McKenna; that they continued drinking until nine-thirty, when McKenna left, and he continued drinking alone. He testified that after that he remembered nothing until the next morning, when he found himself in police headquarters.

It is now argued on behalf of the defendant that by reason of drunkenness his mental state was such that he was incapable of deliberation and premeditation, which are essential to murder in the first degree, and that, therefore, the verdict, which, of course, involved a finding of capacity for deliberation and premeditation, is against the weight of the evidence. We think that the argument is without subtsance in point of fact. In view of the other evidence the jury was fully justified in disbelieving the defendant's testimony as to drunkenness. His testimony as to heavy drinking was not supported in the evidence, being contradicted by Mrs. McKenna. The defendant's testimony as to drunkenness at the time of the killing was flatly contradicted by Mrs. McKenna, who saw the killing, by the numerous witnesses who saw his immediate and agile flight and speedy arrest. and by the numerous witnesses who saw and talked with him at police headquarters at midnight, at which time he made and signed a statement. It is therefore quite clear that the verdict is not against the weight of the evidence.

We shall notice the remaining points made by the defendant in the order in which they have been argued.

The first relates to the denial of the defendant's motion for an adjournment.

When the trial of the indictment was moved the clerk called the roll of the special panel of forty-eight jurors, which

had been drawn from the general panel pursuant to section 82 of the Criminal Procedure act (2 *Comp. Stat., p.* 1847), and served upon the defendant. Only sixteen of these jurors answered to their names. Thereupon, counsel for the defendant moved for an adjournment and the court denied his motion. The record does not disclose why the jurors were absent, but it may be surmised that many of them had been drawn and were serving on other juries in other courts of the county, as so frequently happens in the larger counties.

It has been held in two cases that it is not error to proceed with the trial in the absence of a certain number of jurors of the special panel. *State* v. *Camill Martin,* 94 *N. J. L.* 139; *State* v. *Frank Martin,* 102 *Id.* 388.

The argument of the defendant now is that the denial of the motion for an adjournment should lead to a reversal because he was entitled to an adjournment so that he could investigate the general panel and so prepare to exercise his right of challenge intelligently.

We think that argument is unsound.

Section 83 of our Criminal Procedure act (*Comp. Stat., p.* 1847) expressly declares that "when the special panel or list of jurors served upon a defendant in any case in which the defendant shall be entitled to twenty peremptory challenges shall be exhausted from any cause before a jury for the trial of the indictment shall be obtained, talesmen shall be taken from the general panel of jurors returned, for the term at which such defendant is to be tried, if any remain; * * * the defendant shall not be entitled to the service of a list of the talesmen taken from the general panel after the special panel is exhausted, * * * unless the court specially so direct * * *." No doubt, the reason why the legislature thus declared that the defendant should not be entitled to the service of a list of remaining talesmen of the general panel after the special panel has been exhausted was that the general panel is a public record, readily accessible to the defendant or his counsel, who are advised by the preceding language of section 83 that talesmen will be taken from the general panel, if any remain, when the special panel is exhausted from any cause.

A motion for an adjournment is addressed to the discretion of the court (*State* v. *Bossone,* 88 *N. J. L.* 45; *affirmed,* 89 *Id.* 724; *State* v. *Grossman,* 95 *Id.* 497), and its denial will not lead to reversal unless it appears from the record that the defendant suffered manifest wrong or injury. Criminal Procedure act, section 136. Here there is no such showing. The record discloses that the defendant used but seven of the twenty peremptory challenges to which he was entitled, and there was nothing to indicate but that he was entirely satisfied with and accepted the two jurors who were drawn from the general panel.

It is next contended that the judgment should be reversed because the court permitted the state to re-examine a witness respecting a certain statement made on cross-examination.

Not so. The rule is that it is proper on redirect examination to draw from the witness an explanation of his statements on cross-examination, or matters brought out on cross-examination.

Here, the question asked of Mrs. McKenna was designed to clear up an ambiguity in her statement on cross-examination as to the period of time that intervened between the quarrel in the kitchen and the subsequent killing. That was important upon the question of deliberation, and the re-direct examination was proper.

It is next argued that the judgment should be reversed because the court permitted the witnesses Cook and Egan to testify to an exclamation made by Mrs. McKenna.

We consider that the testimony was properly admitted as part of the *res gestæ.* It is well settled that the *res gestæ* includes those circumstances which are the undesigned incidents of a particular litigated act. They may be separated from the act by a lapse of time more or less appreciable, and may consist of speeches of anyone concerned, whether participant or bystander. They may comprise things left undone as well as things done. They must be the necessary incidents of the litigated act in this sense that they are part of the immediate preparations for, or emanations of, such act, and are not produced by the calculated policy of the

actors.   *Hunter* v. *State*, 40 *N. J. L.* 495; *State* v. *Kane,* 77 *Id.* 244; *Trenton Passenger Railway* v. *Cooper*, 60 *Id.* 219; *Murphy* v. *Browne & Co.*, 91 *Id.* 412.

Tested by this rule the exclamation of Mrs. McKenna that "he has just murdered somebody—catch him," made as she, screaming, pursued the defendant from the house into the street immediately after the killing which she had witnessed, was a part of the *res gestæ*, and was admissible in evidence. It seems entirely reasonable to conclude that such exclamation was an undesigned incident or emanation of the killing, and was spontaneous and unreflecting, without time for invention or misrepresentation.

The defendant next contended that the court erred in permitting the decedent's husband (an Italian) to be asked by the state whether his wife understood and spoke Italian.

The objection urged was that the witness does not know what the woman understood. The answer to that objection is that she spoke some Italian when he married her, and he could know what she understood by the intelligibility of her replies, and the character of her conduct, in response to what was said to her in that language in his presence during the four years that they lived together. This is but another illustration of testimony admissible, not as an expert's opinion, but because a lay witness may state the inference drawn by him from facts within ordinary knowledge occurring in his presence. Many other similar instances are cited in *Koccis* v. *State*, 56 *N. J. L.* 44.

Lastly, the defendant argues that the judgment should be reversed because of an alleged error upon the part of the trial judge in his charge, in defining murder in the second degree.

To this contention it is a sufficient answer to say that the instruction given was, in substance, the one requested by the defendant. And the rule is that a plaintiff in error cannot complain of an error in an instruction which was given at his request.

The judgment under review will be affirmed.

*For affirmance*—THE CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, BLACK, KATZENBACH, CAMPBELL, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ. 13.

*For reversal*—None.